## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 17-11134 TBM |
| TOUCHSTONE HOME HEALTH LLC, | |
| Debtor. | Chapter 11 |
| SANTANGELO LAW OFFICES, P.C., | |
| Movant, | |
| v. | |
| TOUCHSTONE HOME HEALTH LLC, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER GRANTING RELIEF FROM STAY AND COMPELLING ARBITRATION

Does bankruptcy eclipse arbitration?  Arbitration proceedings pending before bankruptcy generally are stopped by the automatic stay — a key protection that allows a bankruptcy debtor breathing space to reorganize.  However, the automatic stay is not impregnable.  Section 362(d)(1)[1] of the Bankruptcy Code permits the Court to grant relief from the automatic stay "for cause."  Moreover, motions for relief from the automatic stay are ubiquitous in bankruptcy cases.  Secured creditors frequently request relief from stay to foreclose on collateral.  Creditors also often ask for permission to liquidate their claims against debtors through continuance of lawsuits pending prior to bankruptcy.  This case presents a somewhat more unusual automatic stay scenario involving the interplay between arbitration and bankruptcy.  The ultimate issue is whether a pre-petition claim against the debtor should be liquidated by arbitration — as mandated by contract — or by the Bankruptcy Court.

The Debtor, Touchstone Home Health LLC (the "Debtor"), provides home healthcare services.  Years before it filed for bankruptcy, the Debtor engaged Santangelo Law Offices, P.C. (the "Law Firm") to protect the Debtor's intellectual property rights.  The parties entered into a

---

[1]     All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

contract spelling out the terms of the attorney-client relationship, including the payment of fees and costs for legal services. Further, the parties agreed that any disputes that might arise between the Debtor and the Law Firm would be resolved by binding arbitration. Two years later, the Debtor became disenchanted with the legal services provided by the Law Firm and the fees charged. The Debtor fired the Law Firm and hired new attorneys.

Notwithstanding its termination as legal counsel, the Law Firm asserted that the Debtor failed to pay the Law Firm's outstanding bill. Receiving no satisfaction of the alleged obligation, the Law Firm commenced an arbitration proceeding against the Debtor in accordance with the parties' contractual arrangement. As is common in these sorts of fee disputes, the Debtor responded by accusing the Law Firm of legal malpractice. The parties completed all fact discovery and designated their expert witnesses. At the Law Firm's request, the arbitrator dismissed the Debtor's legal malpractice counterclaim. The only steps remaining in the arbitration process were for the arbitrator to rule on a pending motion for sanctions brought by the Law Firm and to issue a decision on the merits after conducting a final hearing. But, just a day before an important deadline in the arbitration, the Debtor filed for bankruptcy protection. The bankruptcy petition caused the arbitration to be stayed under Section 362(a)(1).

Promptly after the bankruptcy filing, the Law Firm filed a "Motion for Relief from Stay for Cause and to Enforce Arbitration Agreement Pursuant to Federal Arbitration Act." (Docket No. 46, the "Motion.") The Law Firm sought authorization to complete the arbitral process and liquidate its claim. The Debtor filed its "Response to Motion for Relief from Stay and to Enforce Arbitration Agreement filed by Santangelo Law Offices, P.C." (Docket No. 51, the "Response.") The Debtor opposed the Motion and advocated that the Court should decide the legal fees dispute in the context of the bankruptcy claims allowance and disallowance process under Section 502.

So, how should the Law Firm's claim against its former client be liquidated? The Court determines that relief from stay "for cause" is warranted and the parties must be compelled to liquidate the Law Firm's claim by arbitration. After all, the parties agreed in their contract to resolve all disputes that way. Federal law strongly encourages arbitration as a dispute resolution mechanism. Thus, arbitration agreements generally are enforceable. While the Court attaches significant weight to the pre-bankruptcy arbitration arrangement between the parties, such contract is not itself dispositive. Instead, the Court ultimately must consider whether there is an inherent conflict between arbitration and bankruptcy law. Finding no inherent conflict in the context of this case, the Court is required to enforce the arbitration agreement. Even if the Court had discretion, the Court would exercise such discretion in favor of arbitration.

## I.   Jurisdiction and Venue.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The issues raised in the Motion and Response constitute a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (G) (motions to terminate, annul, or modify the automatic stay), and (O) (other proceedings affecting the liquidation of assets of the estate). This Court has jurisdiction to enter final judgment with respect to the Motion and Response. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

## II.   Procedural Background.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on February 16, 2017. (Docket No. 1.) The Law Firm filed the Motion shortly thereafter. The Law Firm requested relief from stay "to proceed with the liquidation of claims involving the debtor or the debtor's estate pursuant to certain proceedings presently pending in an arbitration proceeding between Movant and Debtor before Arbitrator Dean Hermes, in Fort Collins, Colorado." (Docket No. 46-11.) The Debtor opposed the Motion and contended, among other things, that "cause does not exist for stay relief under Section 362(d)(1) and the *Curtis* factors." (Docket No. 51 at 9.) The Debtor proposes that the dispute between the Debtor and the Law Firm be resolved strictly within the confines of the bankruptcy process.

The Court conducted a Preliminary Hearing on the Motion and the Response in accordance with L.B.R. 4001-1(c)(1). The Court received oral offers of proof and exhibits. After considering various objections, the Court admitted into evidence Exhibits 1-4 and 6-14 offered by the Law Firm, as well as, Exhibit A offered by the Debtor. (Docket No. 61.)[2] The parties presented fulsome legal argument in favor of their respective positions. Furthermore, both the Law Firm and the Debtor agreed that the Court should decide the Motion without an evidentiary hearing. At the conclusion of the Preliminary Hearing, the Court took the matter under advisement and confirmed that the automatic stay under Section 362(a) would remain in place until the Court's determination.[3] The matter is ripe for decision.

## III.   Findings of Fact.

### A.   Engagement of the Law Firm.

The Debtor provides home healthcare services. Sometime during late 2012, the Debtor became aware of another company in the same home healthcare field using a very similar name: Touchstone Health Partners ("THP"). Given the likelihood of confusion between the two companies, the Debtor turned to the Law Firm, which specializes in intellectual property matters, to protect its rights.

The Debtor and the Law Firm entered into an "Agreement for Legal Services," dated December 21, 2012 (Ex. 1, the "Agreement"). The Agreement appears typical for the engagement of legal counsel in a commercial matter. Although the Agreement did not refer to THP by name, the parties limited the scope of the legal retention to intellectual property matters. (*Id.* ¶¶ 1 and 2.) In return for the Law Firm's providing legal services, the Debtor agreed to pay fees and costs according to an "attached Fee and Retainer Account Schedule." (*Id.* ¶ 3.) The "Standard Hourly Rates" for lawyers varied from $270 to $480 per hour depending on the experience of counsel. (*Id.* at Fee and Retainer Account Schedule.) The Law Firm promised to bill costs at "actual or estimated amounts." (*Id.*)

---

[2]     As set forth in the "Minutes of Proceeding/Minute Order" for the Preliminary Hearing, the Court admitted some of the exhibits only in part or for limited purposes. (Docket No. 61.)

[3]     The Law Firm previously waived the timing requirements for decision on the Motion for Relief from Stay under Section 362(e). (Docket No. 54.)

The Agreement provided various remedies if the Debtor failed to timely pay billed legal fees and costs.  The Law Firm's remedies included, among other things, withdrawing from further representation, requiring the Debtor to pledge collateral as security, requiring the Debtor to obtain personal guarantees, converting the relationship to cash-in-advance payments, and filing legal action against the Debtor.  The Debtor committed to pay "a service/interest charge" for any past-due amounts and authorized the Law Firm to recover fees and costs incurred in collection of "any amounts due."  (*Id*. ¶ 3.)

Importantly, the Debtor and the Law Firm also agreed to a forum and venue for resolution of any disputes that might arise between them related to their attorney-client relationship (the "Arbitration Clause").  The Arbitration Clause states:

> *The parties agree to submit any controversy or claim in any way arising from this Agreement or the parties' relationship to confidential binding arbitration in Larimer County, Colorado by a single attorney*.  Such arbitration shall be conducted pursuant to the Commercial Arbitration Rules (CARs) of the American Arbitration Association (AAA) modified for efficiency to: (a) avoid the involvement of the AAA and with service by first-class mail and answer due 20 days thereafter . . . , (b) to provide for the minimal amount of discovery and other pre-hearing procedures consistent with a fair resolution of the dispute, (c) to permit expedited injunctive relief, and (d) to endeavor for the dispute to be resolved within 180 days of the arbitrator's appointment.  For further efficiency, selection of the arbitrator shall be made promptly by two independent attorneys, one of which may be selected by each party.

(*Id*. ¶ 4 (emphasis added).)

B.    <u>Legal Services Provided by the Law Firm</u>.

Having been engaged to assist the Debtor on intellectual property matters, the Law Firm began its legal work with a demand to THP.  (Ex. 3 at 188-90.)  Unsuccessful in resolving the matter consensually, the Law Firm filed a "Verified Complaint" for the Debtor against THP with the Larimer County District Court in the case captioned: *Touchstone Home Health, LLC v. Touchstone Health Partners*, Case No. 2013-CV-20788 (Larimer County District Court, Colorado) (the "Intellectual Property Lawsuit").  (*Id*. at 153-68.)  The Debtor (through the Law Firm) asserted causes of action for trademark infringement, unfair competition, misappropriation, consumer protection violations, and cancellation under Colorado law.  (*Id*.)  The complaint did not allege any claims under federal law.  THP denied the Debtor's causes of action and filed a counterclaim for cancellation of the Debtor's trademark under Colorado law.  (*Id*. at 192-205.)

Thereafter, the Debtor and THP battled in hotly-contested litigation.  (*Id*. at 208-14.) Since the case did not settle early, the Debtor retained a California-based expert witness to assist

4

in prosecution. (Response, Affidavit of Justin Yeater ¶¶ 8-16 [hereinafter, "Yeater Aff. __"].) The Law Firm continued to represent the Debtor in the Intellectual Property Lawsuit until January 12, 2015, at which time the state trial court permitted new legal counsel to substitute for the Law Firm. (*Id*. at 124 and 211.) The Debtor asserts that it terminated the Law Firm based upon the lack of success and mounting legal fees and costs, which greatly exceeded the Debtor's expectations. The Debtor's management testified that the Law Firm advised the Debtor that legal fees would be in the range of $2,000 to $100,000 for pursuing THP. (Yeater Aff. ¶¶ 8-16.) But the costs were much, much more.

During the approximately two years that the Law Firm represented the Debtor, the Law Firm billed the Debtor monthly for legal services by sending invoices. (*Id*. at 47-144.) The Debtor paid approximately $74,325. (*Id*. at 147.) But, as of April 11, 2016, the Law Firm claimed that the Debtor owed an additional $251,029 in delinquent attorneys' fees, costs, interest and charges. (*Id*.)

After the Debtor engaged new legal counsel, the Debtor eventually reached a resolution with THP and entered into a "First Amended Settlement Agreement" to resolve the Intellectual Property Lawsuit. (*Id*. at 216-18.) Under the settlement, the Debtor received a payment of $450,000 from THP. (*Id.*) The Debtor asserts that such settlement amount was far less than the Law Firm had predicted the Debtor would recover. In any event, the Debtor did not use any of the settlement funds to pay the Law Firm.

C.    The Arbitration.[4]

After the Debtor terminated the Law Firm in early 2015, the Law Firm continued to assert that it was owed substantial attorneys' fees, costs, and interest for its work. The Debtor contested any such obligation. As a result of the impasse, and shortly after the settlement between the Debtor and THP, the Law Firm initiated an arbitration proceeding under the Agreement by sending a "Demand for Arbitration," dated July 16, 2015, wherein it demanded "approximately $226,400" for legal fees, costs, and interest. (Ex. 3 at 220; and Ex. 6 at 2.) The arbitration demand was not well-received. The Debtor responded by filing an "Answer and Counterclaim," through which the Debtor denied any liability and also claimed that the Law Firm engaged in "legal malpractice." (Ex. 3 at 220-22.) Unfortunately, the parties could not agree on an arbitrator. So, for the better part of a year, the Debtor and the Law Firm fought over arbitrator selection. (Yeater Aff. ¶¶ 26-27.)

Eventually, the parties appointed an arbitrator to adjudicate their dispute: C. Dean Herms, Jr. (the "Arbitrator"). He issued a "Notice of Commencement," stating that the Arbitration (the "Arbitration") was "effectively commenced"[5] as of May 18, 2016. (Ex. 6 at 2.)

---

[4]    Most of the evidence proffered to the Court by both the Law Firm and the Debtor went to the underlying merits of the Law Firm's fee demand. (*See, e.g.*, Yeater Aff. ¶¶ 11-24.) Such evidence is largely irrelevant for deciding the Motion. The Court does not need to decide the proper amount of the Law Firm's claim now. Instead, the immediate question is where liquidation of the claim should occur. Thus, the Court focuses on the procedural status of the Arbitration rather than the underlying merits.

[5]    As set for the above, the Law Firm actually commenced the Arbitration on July 16, 2015. But, since the parties fought over arbitrator selection issues for so long, the Arbitrator "effectively" started the process anew upon

Promptly after his appointment, the Arbitrator conducted a "Preliminary Hearing" during which the parties presented their positions. (*Id.* at 1.) At the conclusion of the preliminary hearing, the Arbitrator determined the applicable law and procedure. (*Id.* at 2.) He set rather strict discovery limitations concerning the number of interrogatories, requests for production of documents, requests for admissions, and depositions. (*Id.*) Moreover, the Arbitrator established a comprehensive schedule for resolution of the Arbitration in about nine months and set the following deadlines:

| | |
|---|---|
| Initial Disclosures due by: | June 20, 2016 |
| Fact Discovery cutoff: | August 5, 2016 |
| Expert Reports (affirmative claims): | August 30, 2016 |
| Rebuttal Expert Reports: | September 12, 2016 |
| Deadline to Depose Experts: | October 10, 2016 |
| Dispositive Motions deadline: | November 10, 2016 |
| Dispositive Motion Responses deadline: | November 23, 2016 |
| Dispositive Motion Replies deadline: | December 7, 2016 |
| Dispositive Motion Decision Due: | January 6, 2017 |
| Exchange Witness & Exhibit Lists: | January 20, 2017 |
| Arbitration Hearing: | February 6-7, 2017 |

(*Id.* at 3.) Consistent with the Arbitration Clause, the Arbitrator confirmed that the Arbitration Hearing would be conducted in Fort Collins, Colorado. (*Id.*)

The Arbitration did not proceed smoothly. For starters, the parties engaged in discovery battles. The Arbitrator conducted a contested discovery hearing, during which he overruled the Debtor's objections and ordered disclosure of the settlement agreement between the Debtor and THP. (Ex. 14.) Later, the Law Firm filed a motion to compel. Although the Arbitrator determined that the Debtor's responses to various requests for admission were sufficient, the Arbitrator overruled the Debtor's objections to an interrogatory and compelled a complete answer. In doing so, he found that "Touchstone's [Debtor's] answer to Interrogatory No. 6 is evasive and incomplete and [I] deem that it failed to answer." (*Id.* at 5.) The Arbitrator's written decision on discovery issues is both thorough and well-reasoned.

Meanwhile, the parties made their expert disclosures in the Arbitration. (Ex. 3.) The Law Firm designated Robert Brunelli and Peter B. Nagel, as well as the Law Firm's principal, Luke Santangelo, and another lawyer from the Law Firm, David Kerr. (*Id.*) The Debtor designated Thomas P. Howard as an expert. (Ex. A; Yeater Aff. ¶ 29.) The parties completed all fact and expert discovery, except possible depositions of expert witnesses.

Next, the parties proceeded with dispositive motions in the Arbitration. The Law Firm filed a motion to dismiss the Debtor's legal malpractice counterclaim. The Debtor opposed. The Arbitrator issued a comprehensive written decision dismissing the counterclaim. (Ex. 13.) The Arbitrator's decision shows a firm grasp of the facts and merits of the Arbitration.

---

his appointment.

As the hearing date for the Arbitration approached, something very strange happened. The Debtor claimed that the dispute had been settled. But, the Law Firm disputed this, asserting that the Debtor had engaged in a fanciful scheme to fabricate a settlement by using a fake FedEx driver to obtain a signature from the Law Firm on a delivery slip, which signature was then superimposed or forged on a settlement agreement that the Law Firm had not even seen. Trying to get to the bottom of it all, the Arbitrator held a status conference. (Ex. 2V ¶ 1.) Then, he conducted a hearing and determined that "no settlement occurred between the parties." (*Id.* ¶¶ 1-6.) The Arbitrator issued a confirming "Minute Order" a few days later. (*Id.*)

Shortly thereafter, the Law Firm submitted a "Motion for Sanctions" in the Arbitration.[6] (Ex. 2.) The Law Firm argued that the Debtor should be sanctioned for fraud related to the conduct of the Arbitration and the allegedly phony settlement shenanigans. At that point, the Debtor began to delay. The Debtor ultimately filed four motions for extension of time to respond to the Law Firm's motion for sanctions. Having granted the initial extension requests, the Arbitrator conducted another telephonic status conference on January 30, 2017, to address the status of the Arbitration and the Debtor's multiple requests for extensions. (Ex. 11.) Ultimately, the Arbitrator granted the Debtor an additional extension of time to respond to the motion for sanctions through February 17, 2017, and set an evidentiary hearing on the matter for March 21, 2017. (Exs. 11 and 12.) The Debtor's counsel also sought to withdraw from representation of the Debtor in the Arbitration. (Ex. 9.) By that time, the Debtor had spent about $90,000 in legal fees to defend itself in the Arbitration. (Yeater Aff. ¶ 36.)

D.      The Bankruptcy.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on February 16, 2017. (Docket No. 1.) Notably, the Debtor made the bankruptcy filing just one day before the fourth deadline for the Debtor to respond to the Law Firm's motion for sanctions in the Arbitration and about month before the evidentiary hearing on the matter. By the time the Debtor sought bankruptcy protection, the Arbitration was virtually trial-ready. Only two things remained to be done in the Arbitration: first, the Arbitrator needed to decide the motion for sanctions; and second, if the Arbitrator did not issue dispositive sanctions against the Debtor, the Arbitrator needed to conduct the final hearing and issue a decision on the merits.

The Court finds that the Arbitrator was proceeding in a diligent and efficient manner to complete the Arbitration prior to the bankruptcy. It was the Debtor's bankruptcy filing (and multiple requests for extensions of time) that interfered with timely resolution of the Arbitration. Indeed, it is apparent that if the Debtor had not filed for bankruptcy, the dispute likely would have been decided by the Arbitrator many months ago. Furthermore, the Court concludes that the bankruptcy filing itself was a form of forum-shopping through which the Debtor sought to stop the Arbitration and secure a new decision-maker unencumbered by the history of the Arbitration.

---

[6]      The Court need not decide whether the motion for sanctions is meritorious. Indeed, the facts asserted in the motion for sanctions are largely irrelevant for purposes of adjudication of the Motion. Instead, the Court references the motion for sanctions only to illustrate the status of the Arbitration.

In any event, to protect itself in the bankruptcy process, the Law Firm filed a Proof of Claim asserting unpaid fees and costs of $560,193. (Claim No. 4, the "Claim.") The Debtor objected to the Claim and requested resolution in the bankruptcy process. (Docket No. 49.) The Law Firm opposed the Debtor's objection and argued, among other things, that the fee dispute must be resolved through arbitration. (Docket No. 62.)

Meanwhile, the Debtor is struggling in the Chapter 11 bankruptcy process. The Debtor employs about 20 people and serves 80 patients. The Law Firm's Claim is the largest claim against the Debtor. The Debtor proffered that it had cash reserves of about $60,000 and could not afford to arbitrate the Claim. (Yeater Aff. ¶ 36.) The Debtor asserts that it should be able to liquidate the Claim in this Court, and that doing so in this forum would be more cost-effective than proceeding with the arbitration.[7]

IV.   Legal Conclusions.

A.   The Federal Arbitration Act.

1.   The Federal Arbitration Act Establishes a Federal Policy Favoring Arbitration.

The Law Firm contends that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), "mandates the arbitration of the fee dispute" between the Debtor and the Law Firm. (Motion at 4.) No doubt the Law Firm is correct that federal law strongly favors the arbitration of disputes in accordance with arbitration agreements. *Shearson/American Express, Inc. v.*

---

[7]   The Debtor argued that completion of the Arbitration would be more expensive and time-consuming for the Debtor than resolution of the issues through a contested claims objection process in the Court. The Debtor's Chief Financial Officer stated:

> I believe that resolution of Debtor's claim objection before the bankruptcy court and determination of what constitutes a reasonable fee would cost the Debtor less than $10,000 a[nd] require a hearing of one day before the bankruptcy court . . . . I estimate that the Debtor will be forced to incur at least an additional $75,000 in attorneys fees and costs if the Company [the Debtor] i[s] forced to litigate its attorney fee dispute with SLO [the Law Firm] in the arbitration. Debtor cannot afford to incur such additional expenses and will be forced to cease operations.

(Yeater Aff. ¶ 36.) The Court gives little weight to such proffer as it is not factual. Instead, it is merely speculative. Having conducted many hearings and issued several prior written decisions, the Arbitrator is much more familiar with the underlying dispute than the Court. And, the Arbitration Clause requires an efficient procedure for resolution in a timely fashion. The Debtor's assertion that resolution of the Claim in the Court would take only one day and cost just $10,000 is unsupported. The parties designated five expert witnesses in the Arbitration. The parties together submitted affidavits from six witnesses as part of the Motion and Response: Justin Yeater; Barb Hoback; Luke Santangelo; Travis Whitsitt; Lynda Martinez; and Jane Warren. The documentary record tendered for the Motion is voluminous. So, it seems quite unlikely that the claims objection process in the Court would take just a day. Further, common sense suggests that the same testimony and the same witnesses would be presented if the Claim were liquidated in the Arbitration or by the Court. In the end, there is no sound basis for the Court to conclude that completing the Arbitration would be more expensive and time-consuming than judicial resolution by the Court. In fact, since the Court would have to start from scratch, it stands to reason that the trial-ready Arbitration likely would be a less expensive and more expeditious means of liquidating the claim.

*McMahon*, 482 U.S. 220 (1987).

The FAA is the statutory cornerstone of federal arbitration policy.  Section 2 of the FAA is the substantive heart of the law and states:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction . . . shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at
> law or in equity for the revocation of any contract.

9 U.S.C. § 2.  According to the U.S. Supreme Court, Section 2 of the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  The FAA requires that federal courts must, upon request, stay federal litigation if the disputed issue is arbitrable under an arbitration agreement. 9 U.S.C. § 3.  If parties fail or refuse to arbitrate in accordance with an arbitration contract, they may be compelled to arbitrate, as the Law Firm requests in this case.  9 U.S.C. § 4.  To further encourage arbitration of disputes, the FAA also provides that arbitration awards may be confirmed in federal court and thereby receive treatment similar to federal court judgments.  9 U.S.C. § 9.

The U.S. Supreme Court repeatedly has confirmed the liberal reach of the FAA and that federal litigation generally should be stayed while arbitration is compelled — even if the underlying dispute includes claims based upon federal statutes.  *See e.g. Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-4 (1967) (claim of fraud in the inducement of arbitration clause itself generally was a question for arbitrators to decide, not federal courts); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519-20 (1974) (statutory claims under the Securities and Exchange Act of 1934 must be arbitrated and arbitration agreement must be "respected and enforced"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 626-640 (1985) (federal antitrust claims are subject to arbitration under FAA); *McMahon*, 482 U.S. 220 (statutory claims under RICO and Securities Exchange Act of 1934 are subject to arbitration under FAA).  Under the FAA, federal courts must "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985).

       2.     <u>The Federal Arbitration Act Applies Only If the Dispute Affects Interstate Commerce</u>.

All of the foregoing federal law unequivocally favoring enforcement of written arbitration contracts begs the threshold question of whether the FAA applies to any particular arbitration agreement.  The Debtor argues that the FAA is not applicable to this case since "[t]he FAA is limited to maritime cases or disputes involving interstate commerce."  (Response at 6.)  The Debtor contends that "the Court cannot compel arbitration of the disputed [ ] fees under the FAA where the [Law] Firm's claim in no way implicate[s] interstate commerce."  (*Id.* at 6.)

The Debtor is correct that the FAA does not universally govern all arbitration contracts. Instead, the statute is limited to contracts "*evidencing a transaction involving commerce . . . .*" 9 U.S.C. § 2 (emphasis added). What does that phrase mean? Fortunately, the FAA expressly defines the term "commerce." For purposes of the FAA, "commerce" means ". . . commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia . . . ." 9 U.S.C. § 1. Thus, the FAA requires some nexus with interstate commerce.

A trilogy of U.S. Supreme Court decisions — cited both by the Law Firm and the Debtor — helps define the ultra-broad scope of the interstate commerce requirement under the FAA: *Allied-Bruce Terminix Co., Inc. v. Dobson*, 513 U.S. 265, 274-5 (1995); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 102 (2001); and *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003). The *Allied-Bruce Terminix* case involved a contract for the treatment and protection of an Alabama residence against termites. None of the parties "contemplated" a transaction involving interstate commerce. Relying on the "primarily local" nature of the transaction, the state trial court and the Alabama Supreme Court both determined that the FAA did not apply because the contract did not implicate interstate commerce. The U.S. Supreme Court decided otherwise, reversed, and held that the "commerce" requirement is "broad and is indeed the functional equivalent of 'affecting' [interstate commerce]." *Allied-Bruce Terminix*, 513 U.S. at 274-5. Searching for conduct "affecting" interstate commerce under the termite eradication agreement, the U.S. Supreme Court observed that the defendant companies had multistate operations and some of "the termite-treating and house-repairing material" used by the defendant companies on the local residence "came from outside Alabama." *Allied-Bruce Terminix*, 513 U.S. at 282. These exceedingly slim connections to interstate commerce caused a majority of U.S. Supreme Court to rule that the FAA applied.

Some years later, the U.S. Supreme Court faced another FAA question in the context of an employment contract between a California resident working at a California consumer electronics store. *Circuit City*, 532 U.S. 105. The main issue was whether an employment agreement (which contained an arbitration provision) was exempt from the FAA. Although the decision focused on the statutory exemption for certain employment contracts,[8] the U.S. Supreme Court seemed to acknowledge in passing that the contract affected interstate commerce within the meaning of the FAA because the employer was "a national retailer of consumer electronics." *Id.* at 109; *see also CarMax Auto Superstores of Cal. LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1101 (C.D. Cal. 2015) (citing *Allied-Bruce Terminix* and *Circuit City* in concluding that employment contract with "national corporation that did business in thirty-six states" and engaged in interstate transactions on a regular basis was sufficient to demonstrate effect on interstate commerce and require application of FAA).

The last of the U.S. Supreme Court trilogy of cases construing the scope of the FAA involved review of another Alabama dispute. *Alafabco*, 539 U.S. 52. The question was whether a debt-restructuring contract executed in Alabama by an Alabama bank and an Alabama builder was governed by the FAA. As in *Allied-Brice Terminix*, the Alabama Supreme Court had

---

[8]   *See* 9 U.S.C. § 1. That statutory exception is not implicated in the contract between the Debtor and the Law Firm.

determined that Alabama law, not the FAA, governed. The U.S. Supreme Court acknowledged that the financial transactions facially were Alabama-centric but found a few interstate commerce connections: the plaintiff Alabama builder engaged in business outside of Alabama using loans from the Alabama bank; the Alabama builder's business assets included its inventory of goods assembled from "out-of-state parts and raw materials"; and commercial lending is subject to federal control and has broad impact on the national economy. *Alafabco*, 539 U.S. at 57-58. Thus, the U.S. Supreme Court held that contract affected interstate commerce within the meaning of the FAA. *Id*. at 58.

The lesson of *Allied-Bruce Terminix*, *Circuit City*, and *Alafabco* is that the interstate commerce hurdle under the FAA is extremely low. Almost anything will do. Put another way by a leading arbitration treatise:

> . . . a contract needs only the slightest nexus to interstate commerce to apply the FAA . . . [and] the FAA § 2 requirements are met where contractual activity facilitates or affects [interstate] commerce even tangentially, or where a contract is in any way connected to interstate commerce.

Thomas H. Oehmke and Joan M. Brovins, Oehmke Commercial Arbitration § 3.6 (Thompson Reuters 3d. Ed. Supp. 2016) [hereinafter, "Oehmke Arbitration § __"].

   3.   The FAA Applies Since the Debtor Engaged a California Expert Witness in the Intellectual Property Lawsuit.

Given the broad reading mandated by the U.S. Supreme Court under the FAA, many — perhaps most — commercial contracts likely affect interstate commerce. The same is true for many attorney-client engagement agreements. Such contracts may satisfy the interstate commerce requirement of the FAA if:

- The client engages a law firm located in a different state than the client.
- The law firm performs legal services in a different state than the client.
- The client or the law firm engage in interstate travel in connection with the representation.
- The client or the law firm (or parties or witnesses) engage in interstate communications in connection with the representation.
- The legal work involves claims under federal law.
- The law firm or the client has offices in multiple states.
- The law firm retains an expert witness in a different state than the client.
- The law firm uses out-of-state products in connection with the representation.
- The attorney-client contract expressly provides for the application of the FAA.

*See*, *e.g., Meierhenry Sargent LLP v. Williams*, 2017 WL 1653312 (D.S.D. May 1, 2015) (FAA applied to attorney retention agreement for legal services to be performed in South Dakota for Minnesota residents and listing cases in which FAA held to be applicable to attorney fee agreements); *Lucey v. Meyer*, 736 S.E.2d 274 (S.C. App. 2012) (FAA applied since attorney

engaged in extensive out-of-state travel in connection with representation); *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442 (Fla. Ct. Crim. App. 2008) (FAA applied since underlying lawsuit involved a federal intellectual property cause of action, representation was by attorneys in different states than client, and signatories to contract were in different states).

But, while not much is needed for the FAA to apply to an attorney-client agreement, the contractual arrangement must affect interstate commerce in some way. *Allied-Bruce Terminix*, 513 U.S. at 274-5. In this case, most facts show only an intrastate relationship. Both the Debtor and the Law Firm are located in Colorado and have no offices or operations elsewhere. They signed the Agreement in Colorado. The Agreement confirms that "Colorado law shall apply" and makes no mention of the FAA nor the application of any federal law. (Ex. 1.) Further, the Agreement does not suggest that any legal work will be performed outside of Colorado. All of the lawyers at the Law Firm who worked on the representation were located in Colorado. All of the invoices sent by the Law Firm were sent to the Debtor in Colorado and requested payment of the Law Firm in Colorado. In terms of the work actually performed, the Law Firm sent a demand letter to THP in Colorado. (Ex. 3 at 188-89.) The Law Firm prepared the complaint against THP and filed it in the Larimer County District Court. (Ex. 3 at 153-67.) The Debtor asserted in the complaint that both the Debtor and THP operated only in Colorado and filed trademark registrations in Colorado. Both the Debtor in the complaint and THP in its counterclaim in the Intellectual Property Lawsuit asserted claims only under Colorado law. (*Id.* and 192-206.)

Although the relationship between the Debtor and the Law Firm clearly was Colorado-focused, there was at least one important interstate dimension of the work performed under the Agreement. At the recommendation of the Law Firm, the Debtor retained a California-based expert witness for the Intellectual Property Lawsuit. The Debtor's Chief Financial Officer testified as follows by affidavit:

> The Debtor paid . . . an additional $30,000 to retain and compensate a California-based expert witness [for the Intellectual Property Lawsuit] . . . . Mr. Santangelo [from the Law Firm] told me the California expert was the only expert who could provide the testimony needed for the case. I [the Debtor] ultimately agreed to pay the California-based expert a minimum of $20,000 for his services, which would increase to $50,000 if trial was necessary.

(Yeater Aff. ¶¶ 17-18.)

The facts show that the Law Firm contacted and recommended an out-of-state expert witness, the Debtor retained the California expert, and the Debtor paid him. All of the foregoing occurred within the context of the legal services provided under the Agreement. This very slender interstate reed is sufficient to satisfy the extremely low interstate threshold necessary to trigger application of the FAA. *Allied-Bruce Terminix*, 513 U.S. at 274-75; *Circuit City*, 532 U.S. at 109; *Alafabco*, 539 U.S. at 57-58. Thus, the FAA governs arbitration under the Arbitration Clause.[9]

---

[9]     Even if the FAA did not apply, Colorado law also strongly favors arbitration. The people of Colorado enshrined pro-arbitration principles in the original 1876 Colorado Constitution, many years before arbitration gained widespread acceptance at the federal level. The Colorado Constitution requires the Colorado legislature "to pass such laws as may be necessary and proper to decide differences by arbitrators, to be appointed by mutual agreement

B.    Arbitration Meets Bankruptcy.

1.    Arbitration and Bankruptcy Serve Some Different Purposes.

Arbitration is strongly favored at both the federal and state levels.  Why?  Undoubtedly, part of the allure of arbitration is the sanctity of contracts — especially commercial contracts.  If both parties freely and voluntarily agree in advance to resolve any contractual disputes by arbitration, such provision should be enforced.  Arbitration is generally a prompt, efficient, and fair mechanism for dispute resolution.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-45 (2011) ("The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures . . . .  And the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution."); *Mitsubishi Motors,* 473 U.S. at 628 ("[Arbitration] trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.").  The parties are free to negotiate and agree on many important issues including:  the selection of an arbitrator (who may have specialized expertise in the subject matter of the contract); the number of arbitrators; the pre-hearing procedural rules; the arbitral institution (unless the parties elect *ad hoc* arbitration); the confidentiality of proceedings; the location for hearings; the scope and limitations on discovery; the conduct of hearings; the form of arbitral decision; and the time for resolution.  *See* OEHMKE ARBITRATION § 1.1 (identifying "oft-cited benefits of arbitration").  Arbitration also has the collateral effect of assisting in relieving crowded federal and state court dockets.  While arbitration is not some sort of dispute resolution panacea,[10] suffice to say that the current legal framework — embodied in the FAA — supports arbitration of commercial disputes.

Uniform federal bankruptcy law[11] serves some different objectives than the laws promoting arbitration.  According to the U.S. Supreme Court:

---

of the parties to the controversy who may choose that mode of adjustment."  COLO. CONST. ART. XVIII, § 3. Consistent with such requirement, the Colorado legislature enacted various arbitration statutes ultimately culminating in the Colorado Uniform Arbitration Act, COLO. REV. STAT. § 13-22-201 *et seq.* (the "CUAA").  Such law is extremely similar to the FAA.  The CUAA is "a uniform statutory framework for arbitration in order to encourage the settlement of disputes."  *Lane v. Urgitus*, 145 P.3d 672, 678 (Colo. 2006).  *See also Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 493 (Colo. 1998) ("arbitration is a favored method of dispute resolution"); *Judd Constr. Co. v. Evans Joint Venture*, 642 P.2d 922, 924 (Colo. 1982) ("Arbitration provides an efficient, convenient alternative to litigation, and it has long been the policy of this state to foster and encourage the use of arbitration as a method of dispute resolution."); *Ezell v. Rocky Mountain Bean & Elevator Co.*, 232 P. 680, 681 (Colo. 1925) ("having contracted to submit to arbitration the identical questions at issue in this cause, [plaintiff] was bound by that contract"); *Wilson v. Wilson*, 34 P. 175, 177 (Colo. 1893) ("Arbitration is favored by the law, as a convenient mode of adjusting disputes.  Parties, after having selected their own judges, as a general rule, should be bound by the result.")  And, "all doubts as to whether a dispute is arbitrable are to be resolved in favor of arbitration."  *Lane*, 145 P.2d at 680 (citation omitted).

[10]    Arbitration also has its detractors.  Arbitration sometimes is not as speedy and economical as claimed.  In the name of expediency, the parties may give up important due process, procedural, and appellate protections.  The public forum also is diminished as disputes are resolved behind closed doors without the development of public judicial precedent.  And, special concerns may be present in consumer transactions.

[11]    U.S. CONST., ART. I, § 8 ("Congress shall have the power to establish . . . uniform laws on the subject of bankruptcies throughout the United States.").

13

> . . . a central purpose of the [Bankruptcy] Code is to provide a
> procedure by which certain insolvent debtors can reorder their
> affairs, make peace with their creditors, and enjoy 'a new
> opportunity in life with a clear field for future effort, unhampered
> by the pressure and discouragement of preexisting debt.'

*Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934)). Thus, in the individual context, the "honest but unfortunate debtor" who satisfies the requirements of the Bankruptcy Code stands to gain a "fresh start" through discharge. *Id.* at 286-87; *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"). For Chapter 11 corporate filings, like this case, the goal is reorganization. 11 U.S.C. § 1101 *et seq.* And, "the fundamental purpose of [Chapter 11] reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984). To be successful in Chapter 11, "debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate . . . ." *Czyzewski v. Jevic Holding Corp.*, __ U.S. __, 137 S.Ct. 973, 978 (2017) (listing "a few fundamentals" in Chapter 11 bankruptcy cases). The Bankruptcy Code sets forth a comprehensive system of priorities that ensures equality of distribution between similarly situated creditors. *Id.* at 980; *Clarke v. Rogers*, 228 U.S. 534, 548 (1913) ("Equality between creditors is necessarily the ultimate aim of the bankrupt[cy] law").

The modern bankruptcy system depends, in significant part, upon centralization. *See Appel v. Gable (In re B&L Oil Co.)*, 834 F.2d 156, 159 n.8 (10th Cir. 1987) (addressing venue transfer and noting that "centralizing proceedings in one court" "furthers important goals in the efficient administration of bankruptcy cases"). The debtor and creditors are initially brought into a single forum — the bankruptcy court. 28 U.S.C. §§ 1334(a) and (b) ("the district court [of which the bankruptcy court is a unit] shall have original and exclusive jurisdiction of all cases under title 11 . . . and original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"). It is there that debtors file their schedules of assets and liabilities, officers are appointed and compensated, bankruptcy cases are administered, creditors submit their claims, parties seek allowance or disallowance of claims, trustees or debtors in possession pursue avoidance actions, and parties engage in the reorganization process. *See id.*, 28 U.S.C. § 157 (itemizing "core proceedings"); 11 U.S.C. §§ 301, 321-331, 361-366, 501-503, 541-551, 1101-1146. The imposition of an automatic stay during the pendency of the bankruptcy case stops the "race to the courthouse" and further promotes centralization in the bankruptcy court. 11 U.S.C. § 362(a); *SEC v. Miller*, 808 F.3d 623, 630 (2d Cir. 2015) ("The automatic stay . . . serves 'one of the core purposes of bankruptcy,' by enabling 'the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'").

But, while arbitration and bankruptcy serve some different general purposes, there is at least one commonality with respect to claims liquidation. Arbitration is a summary process designed to reach a prompt conclusion. Bankruptcy claims adjudication is similar in the sense that it does not typically involve a full-blown lawsuit. It is designed to be fairly quick so that

there is no interference with the bankruptcy process.  In that way, liquidation of claims in arbitration and bankruptcy serves the same basic objective:  to quickly decide how much is owed.

       2.     <u>Bankruptcy and Arbitration Issues Under the FAA</u>.

      What happens when arbitration and bankruptcy meet?  This is a difficult question that neither the U.S. Supreme Court nor the Circuit Court of Appeals for the Tenth Circuit has addressed directly.  In the absence of binding precedent, the Court turns elsewhere for guidance.  Appellate courts in several other jurisdictions have considered the interplay of the FAA and the Bankruptcy Code.  All have relied on an analogous U.S. Supreme Court decision, *McMahon*, 482 U.S. 220, which did not involve bankruptcy.

      In *McMahon*, securities brokerage customers filed a federal lawsuit against a broker notwithstanding an arbitration provision in their customer account contracts.  The customers claimed that the securities firm fraudulently churned their accounts in violation of two federal statutes: the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); and the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act").  The brokerage moved to compel arbitration under the FAA.  On appeal, the U.S. Supreme Court considered whether the brokerage could compel arbitration of federal statutory claims.  Writing for the majority, Justice O'Connor paid homage to the "federal policy favoring arbitration" and noted that the FAA "standing alone . . .  mandates enforcement of agreements to arbitrate statutory claims."  482 U.S. at 226.  However, the U.S. Supreme Court also recognized the possibility that the FAA could conflict with, and potentially be subordinate to, other federal statutes:

> Like any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command.  The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' . . . or from an inherent conflict between arbitration and the statute's underlying purposes.

*Id.* at 226-27 (internal citations omitted).  After analyzing RICO and the Exchange Act, the U.S. Supreme Court ultimately determined that Congress did not intend to prohibit arbitration of claims under such federal statutes.  Instead, the brokerage could compel arbitration of the RICO and Exchange Act claims under the FAA.  *Id.* at 238 and 242; *see also Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483-85 (1989) (relying on *McMahon* framework and determining that defendant could compel arbitration of claim under Securities Act of 1933).

      Although *McMahon* did not involve the Bankruptcy Code, six U.S. Circuit Courts of Appeals (and a host of district and bankruptcy courts) have determined that the *McMahon*

framework applies to FAA arbitration issues arising in bankruptcy cases.[12]  In the insolvency context, the *McMahon* framework requires the court to analyze: (1) the text and legislative history of the Bankruptcy Code; and (2) whether there is an inherent conflict between arbitration and the underlying purpose of the Bankruptcy Code.

> a. <u>The Text and Legislative History of the Bankruptcy Code Do Not Establish a Congressional Intent to Exclude the FAA</u>.

The word "arbitration" does not appear anywhere in the Bankruptcy Code.  Neither does the  FAA.  And, the legislative history of the Bankruptcy Code contains merely a single passing reference to arbitration as part of a discussion of the automatic stay.[13]  While confirming that pending arbitration proceedings are stayed upon the filing of bankruptcy — just as federal and state lawsuits also are stayed — the legislative history adds nothing more.

So, under the *McMahon* analysis, neither the text nor the legislative history of the Bankruptcy Code evidences congressional intent to override the FAA.  Appellate precedent uniformly rejects overriding the FAA based on the text or the legislative history of the Bankruptcy Code.  In such respect, the *Eber* decision is typical:

> This [Ninth] Circuit and sister circuits applying the *McMahon*
> factors to the Bankruptcy Code have found no evidence in the text

---

[12]     <u>Second Circuit</u>:  *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006) (reversing denial of motion to compel arbitration of core claim for violation of automatic stay); *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160 (2d Cir. 2000) (bankruptcy courts have authority to stay non-core proceedings in favor or arbitration); *U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631 (2d Cir. 1999) (determining that bankruptcy court need not compel arbitration of insurance declaratory judgment action under FAA).

<u>Third Circuit</u>:  *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222 (3d Cir. 2006) (reversing denial of motion to compel arbitration; bankruptcy court lacked authority and discretion to deny enforcement of arbitration for rescission claim); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) (reversing denial of motion to compel arbitration of noncore claims).

<u>Fourth Circuit</u>:  *Moses v. Cashcall, Inc.*, 781 F.3d 63 (4th Cir. 2015) (reaffirming in part and reversing in part denial of motion to compel arbitration; some claims must be arbitrated and other claims could be decided by court); *White Mountain Mining Co., L.L.C. v. Congelton (In re White Mountain Mining Co., L.L.C.)*, 403 F.3d 164 (4th Cir. 2005) (affirming denial of motion to compel arbitration of core claim to establish debt).

<u>Fifth Circuit</u>:  *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002) (affirming denial of motion to compel arbitration of core fraudulent transfer and avoidance claims); *Ins. Co. of N. Am. v. NCG Settlement Tr. & Asbestos Claims Mgmt. Co. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1066 (5th Cir. 1997) (affirming denial of motion to compel arbitration of core discharge injunction claims).

<u>Ninth Circuit</u>:  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 821 F.3d 1146 (9th Cir. 2016) (affirming denial of motion to compel arbitration of core fraudulent conveyance, subordination, and disallowance claims); *Ackerman v. Eber (In re Eber)*, 687 F.3d 1123 (9th Cir. 2012) (affirming denial of motion to compel arbitration of core nondischargeability claims); *Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012) (affirming denial of motion to compel arbitration of breach of contract claim).

<u>Eleventh Circuit</u>:  *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc. (In re Elec. Mach. Enters., Inc.)*, 479 F.3d 791, 796 (11th Cir. 2007) (determining that bankruptcy court erred in denying motion to compel arbitration of constructive trust claim).

[13]     The Senate Report states only: "The scope of . . . Section 362(a)(1) is broad.  All proceedings are stayed, including arbitration, administrative, and judicial proceedings."  S. Rep. No. 989, 95th Cong., 2d Sess. 50 (1978).

of the Bankruptcy Code or in the legislative history suggesting that
Congress intended to create an exception to the FAA in the
Bankruptcy Code.

*Eber*, 687 F.3d at 1129.  *See also Thorpe Insulation,* 671 F.3d at 1020 ("Neither the text nor the
legislative history of the Bankruptcy Code reflects a congressional intent to preclude arbitration
in the bankruptcy setting."); *Whiting-Turner,* 479 F.3d at 796 ("[W]e find no evidence within the
text or in the legislative history that Congress intended to create an exception to the FAA in the
Bankruptcy Code."); *Mintze*, 434 F.3d at 231 ("We find no evidence of such intent [to override
the FAA] in either the statutory text or the legislative history of the Bankruptcy Code.")

        b.    <u>In the Absence of Bankruptcy Code Text or Legislative History Excluding
the FAA, a Party Opposing Arbitration Must Show an Inherent Conflict
Between FAA Arbitration and the Bankruptcy Code.</u>

      Since neither the text nor the legislative history of the Bankruptcy Code reveals
congressional intent to override the FAA, the only remaining *McMahon* inquiry requires an
assessment of whether there is an "inherent conflict" between arbitration and the Bankruptcy
Code in the context of particular causes of action.  To decide such question, most courts start by
considering whether the claims at issue in the arbitration are core or noncore claims.

      The Bankruptcy Code defines statutory "core proceedings" under 28 U.S.C. § 157(b)(2)
by way of a non-exclusive listing.  Core proceedings include, among others: matters concerning
administration of the estate; allowance or disallowance of claims; counterclaims by the estate;
avoidance actions (preference and fraudulent conveyance claims); motions for relief from stay;
determinations of dischargeability and objections to discharge; confirmation of plans;
determinations of the validity, extent, or priority of liens; orders for obtaining credit, turning over
property, approving use or lease of property; and "other proceedings affecting the liquidation of
the assets of the estate or the adjustment of the debtor-creditor . . . relationship."  *Id.*  Most core
proceedings derive exclusively from the Bankruptcy Code itself and constitute the heartland of
insolvency cases.  In broad strokes, noncore claims consist of claims between the parties that
exist outside of bankruptcy and do not depend on the Bankruptcy Code.

      The distinction between core and noncore claims is relevant to the arbitration inquiry.
That is because "[i]t is generally accepted that a bankruptcy court has *no discretion* to refuse to
compel the arbitration of matters not involving 'core' bankruptcy proceedings . . . ."  *Gandy*, 299
F.3d at 495 (emphasis added).  Put slightly differently, noncore claims in insolvency proceedings
must be arbitrated if the requirements of the FAA are met.  *See Thorpe Insulation*, 671 F.3d at
1021; *Whiting-Turner*, 479 F.3d at 796; *MBNA Am.*, 436 F.3d at 108; *Crysen/Montenay*, 226
F.3d at 166; *Hays*, 885 F.2d at 1156.  The reason is that "noncore proceedings . . . are unlikely to
present a conflict sufficient to override by implication the presumption in favor of arbitration."
*U.S. Lines*, 197 F.3d at 640.

      The intersection of core proceedings and arbitration is much less definitive.  Core
proceedings implicate "more pressing bankruptcy concerns, but even a determination that a

proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration."
*Id.*; *see also Mintze,* 434 F.3d at 231. To the contrary, even for core claims:

> Where an otherwise applicable arbitration clause exists, a
> bankruptcy court lacks the authority and discretion to deny its
> enforcement, *unless* the party opposing can establish congressional
> intent, under the *McMahon* standard, to preclude waiver of judicial
> remedies for the statutory rights issue.

*Mintze,* 434 F.2d at 231 (emphasis in original). *See also Thorpe Insulation,* 671 F.3d at 1021;
*Whiting-Turner,* 479 F.3d at 796; *MBNA Am.,* 436 F.3d at 108; *Gandy,* 299 F.3d at 495. The
reason that there is no hard-and-fast rule barring arbitration of core proceedings is that not all
core bankruptcy proceedings are premised upon provisions of the Code that 'inherently conflict'
with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily
jeopardize the objectives of the Bankruptcy Code. *Nat'l Gypsum*, 118 F.3d at 1067. Finally,
even if the opponent of arbitration establishes an "inherent conflict" between the FAA and the
Bankruptcy Code in a specific case, the bankruptcy court still has the discretion to compel
arbitration. *Cashcall*, 781 F.3d at 71 ("Where such an intent [to override the FAA] can be
deduced [under *McMahon*], the court of first impression has *discretion* to decide whether to
withhold arbitration . . . .") (emphasis in original).

In this case, the Debtor characterizes the dispute between the parties as one related to
"claims objection" and, therefore, "core." The Court agrees that objections to claims are matters
related to "allowance or disallowance of claims against the estate." However, it is important to
note that the Law Firm is not seeking relief from the stay to establish that its claim is allowed
under Section 502, but rather to prosecute a breach of contract claim and to liquidate damages in
connection with prosecution of that claim. While liquidation may, in some cases, be part of
allowance under Section 502, liquidation is *not* the same as allowance of a claim. *See*, *e.g.*, *G-I
Holdings, Inc.*, 323 B.R. 583, 607 (Bankr. D.N.J. 2005) ("bankruptcy court jurisdiction over the
claims allowance process is distinct from liquidation for purposes of distribution"); *In re
Chateaugay Corp.*, 111 B.R. 67, 74 (Bankr. S.D.N.Y. 1990) ("Allowing or disallowing claims is
clearly a separate and distinct function from liquidating or estimating that claim."); *In re
Comstock Fin. Servs., Inc.*, 111 B.R. 849, 856-857 (C.D. Cal. 1990) (explaining that
"liquidation" is merely one step in the allowance process).

In any event, rather than merely relying on the labels "core" and "noncore," it makes most
sense to focus on "the underlying nature of the proceeding, *i.e.,* whether the proceeding derives
exclusively from provisions of the Bankruptcy Code and, if so, whether arbitration of the
proceeding would conflict with the purposes of the [Bankruptcy] Code." *Nat'l Gypsum*, 118
F.3d at 1067. The dispute between the Law Firm and the Debtor definitely does not derive
exclusively from the Bankruptcy Code. Instead, unlike many core proceedings, the underlying
controversy between the Law Firm and the Debtor stems from Colorado state law. It is a breach
of contract claim that existed before the Debtor filed for bankruptcy, as evidenced by the
commencement of the Arbitration. In that sense, although the dispute is statutorily "core," it is
nevertheless a much weaker type of "core" than a proceeding arising directly from the

18

Bankruptcy Code — such as an action for nondischargeability of debt or an avoidance action to recover a bankruptcy preference.

In a case involving arbitration and a series of different types of "core" claims, *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181 (Bankr. S.D.N.Y. 2002), the court explained by characterizing the claims as "procedurally core" or "substantively core":

> If the matter is core, the bankruptcy court must still examine the nature and reason for its 'coreness.'  Many proceedings are procedurally core; they are garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved.  Objections to proofs of claim and counterclaims asserted by the estate . . . exemplify this type of matter.  The arbitration of a procedurally core dispute rarely conflicts with any policy of the Bankruptcy Code unless the resolution of the dispute fundamentally and directly affects a core bankruptcy function.

> Other proceedings are core for substantive reasons; they are not based on the parties' pre-petition relationship, and involve rights created under the Bankruptcy Code.  [S]uch disputes will often fail the preliminary question of arbitrability because the parties did not agree to arbitrate them.  Nevertheless, even if they are covered by the arbitration clause, it is more likely that arbitration will conflict with the policy of the Bankruptcy Code that created the right in dispute. The bankruptcy court enjoys much greater discretion to refuse to compel the arbitration of this type of dispute.

*Id*. at 203 (internal citations omitted).  *See also Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78, 90-92 (Bankr. S.D.N.Y. 2010) (distinguishing "procedurally core" and "substantively core" claims); Andre Albertini, *Arbitration in Bankruptcy: Which Way Forward*, 90 AMER. BANKR. L. J. 599, 610-13 (2016) (recognizing distinction between "substantially core" and "procedurally core" proceedings; "all core proceedings are created equal, but some proceedings are more core than others").

Thus, under the FAA, the Debtor has the burden of showing that arbitration of the procedurally core claim asserted by the Law Firm for fees under the Agreement somehow conflicts directly with the Bankruptcy Code.  Such determination "requires a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy."  *MBNA Am.*, 436 F.3d at 108.

> c.      The Debtor Has Not Met Its Burden to Establish an Inherent Conflict Between the Bankruptcy Code and the FAA.

Recognizing that inherent conflict between arbitration and the Bankruptcy Code is the key issue, the Debtor argues that "compelling arbitration of the disputed . . . fees *conflicts with the purpose of the Bankruptcy Code* to provide a centralized forum to adjudicate creditor claims

and pay such claims pursuant to a Chapter 11 plan." (Response at 8 (emphasis added).) In addition to making a centralization argument, the Debtor also asserts that "plan confirmation cannot proceed until the . . . claim is resolved" and the Debtor "can liquidate the disputed fee claim before [the Bankruptcy Court] in a much more cost-efficient manner" as compared to the Arbitration. (*Id*.) The Debtor suggests that it "cannot continue operations and cannot reorganize if [the Debtor] is forced to continue defending itself in the arbitration proceedings." (*Id*. at 8-9.)

The Debtor is correct that the Bankruptcy Code establishes a process for allowance or disallowance of claims. After the commencement of a bankruptcy case, a creditor may file a proof of claim. 11 U.S.C. § 501; Fed. R. Bankr. P. 3001-3005. The filing of a proof of claim subjects a creditor to the bankruptcy court's jurisdiction. *Langencamp v. Culp*, 498 U.S. 42, 44-45 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 n.14 (1990); *Katchen v. Landy*, 382 U.S. 323, 336 (1966). Once filed, proofs of claim are "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a); *see also* Fed. R. Bankr. P. 3007. If an objection to a proof of claim is filed, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount . . . ." 11 U.S.C. § 502(b). *See also* Fed. R. Bankr. P. 3007. The claims allowance and disallowance process is a core proceeding under 28 U.S.C. § 157(b)(2)(B). And, as the Debtor argues, the claims allowance and disallowance process is consistent with centralization of disputes in the bankruptcy process.

But the bankruptcy claims allowance and disallowance process is not the *only* way to liquidate a claim in a bankruptcy case. Instead, creditors routinely request relief from stay for cause under Section 362(d)(1) to liquidate claims outside of bankruptcy through pending federal and state court proceedings. *See In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984) (setting forth factors for relief from stay to continue state court proceedings). Moreover, such requests are granted every day in bankruptcy courts across the country. *See Jim's Maint. & Sons, Inc. v. Target Corp. (In re Jim's Maint. & Sons, Inc.)*, 418 Fed. Appx. 726 (10th Cir. 2011) (unpublished) (approving *Curtis* factors by implication and affirming relief from stay for continuance of federal litigation); *Dampier v. Credit Invs., Inc. (In re Dampier),* 2015 WL 6756446, at *2 (10th Cir. BAP Nov. 5, 2016) (unpublished) (noting that "[i]n the absence of a comprehensive Tenth Circuit test, a list of factors identified in *In re Curtis* is often relied on by courts in their determination of whether stay relief should be granted" and affirming order granting relief from stay to allow state court litigation to proceed); *Robert & Joan Dennen Tr. v. Dennen (In re Dennen)*, 539 B.R. 182, 186 (Bankr. D. Colo. 2015) (same; cause existed for relief from stay to allow state court litigation to proceed). Allowing liquidation of claims through existing federal or state court cases does not inherently conflict with the Bankruptcy Code.

Permitting liquidation of proofs of claim through arbitration is similar — except that the reason for favoring arbitration is even stronger than the rationale supporting deference to pending federal and state litigation. That is because, as in this case, the parties contractually agreed to arbitration prior to bankruptcy. And, federal law strongly favors arbitration. It is true that allowing arbitration goes against the general principle of centralization in bankruptcy cases. However, there is no express bankruptcy prohibition against allowing arbitration. Indeed, Section 362(d)(1) provides a ready mechanism for permitting arbitration to proceed if warranted under the circumstances. The U.S. Supreme Court has confirmed on multiple occasions that arbitration is generally a prompt, efficient, and fair mechanism for dispute resolution. *AT&T*

*Mobility*, 563 U.S. at 344-45; *Mitsubishi Motors,* 473 U.S. at 628.  Thus, claims liquidation arbitration supports the objectives of the bankruptcy system rather than conflicting with them because it provides a mechanism for quick, economical, and fair dispute resolution.

The lack of inherent conflict between arbitration and the Bankruptcy Code is demonstrated by many bankruptcy decisions approving liquidation of claims through arbitration.[14]  At the appellate level, *National Gypsum* uses claims liquidation arbitration as the archetypical example of a proceeding which does not inherently conflict with the Bankruptcy Code.

> In the most common type of creditor-initiated core proceeding — a motion for relief from the automatic stay — bankruptcy courts regularly have permitted arbitration to continue (or commence) in spite of the presence of core bankruptcy jurisdiction.  In those cases permitting arbitration, courts have typically found little difficulty with arbitration of disputes where resolution would not involve matters of federal bankruptcy law.

*Nat'l Gypsum*, 118 F.3d at 1068 (citing a series of decisions allowing relief from stay for arbitration to liquidate claims).

Closer to home, a Colorado decision illustrates the absence of conflict between arbitration and the Bankruptcy Code.  In *D.E. Frey Group, Inc. v. FAS Holdings, Inc. (In re D.E. Frey Group, Inc.)*, 387 B.R. 799 (D. Colo. 2008), the court stated quite unequivocally:

> Enforcing an arbitration clause does not jeopardize the policy underlying the Bankruptcy Code's preference for centralization of disputes concerning the bankruptcy estate, even in core civil proceedings.

*Id.* at 806.[15]  The "no inherent conflict" holding of *D.E. Frey* is consistent with the majority approach across the country in relation to motions for relief from stay to liquidate claims by arbitration.  *See In re No Place Like Home, Inc.*, 559 B.R. 863 (Bankr. W.D. Tenn. 2016) ("claims at issue arise strictly out of the FLSA and contract law.  There is no underlying bankruptcy issue to be determined and, therefore, there can be no inherent conflict between the

---

[14]  The Court need focus only on arbitration for purposes of liquidating claims.  Although there are many decisions concerning arbitration in other contexts (for example, dischargeability, avoidance actions, declaratory judgment actions, and the like), those circumstances raise different issues concerning "coreness."

[15]  The *D.E. Frey* court supported its analysis by observing that an arbitration provision merely is a form of forum selection clause.  Citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), the court stated:  "In terms of determining whether to enforce a forum selection clause or an arbitration clause, 'there is little difference between the two,' and, accordingly, a motion to enforce a forum selection clause is 'analytically indistinguishable from a motion to stay an action at law pending arbitration.' . . .  Thus — like an arbitration clause — the Bankruptcy Court here must enforce the forum selection clause unless the forum would be excluded as inherently unfair under *Bremen*."  *D.E. Frey*, 387 B.R. at 806 (reversing bankruptcy court and directing enforcement of forum selection clause) (internal citations omitted).

FAA and the Bankruptcy Code."); *In re Consolidated FGH Liquidating Tr.*, 419 B.R. 636 (Bankr. S.D. Miss. 2009) (granting relief from stay to compel arbitration to liquidate claims); *In re Transport Assocs., Inc.*, 263 B.R. 531, 535 (Bankr. W.D. Ky. 2001) (granting motion to compel arbitration of objection to creditor's claim even though issue arose through claims allowance and disallowance process and noting that "the arbitration of this contractual dispute does not directly conflict with the Bankruptcy Code"); *In re Statewide Realty Co.*, 159 B.R. 719 (Bankr. D.N.J. 1993) (granting motion for relief from stay to compel arbitration to liquidate claims after concluding that debtor "fail[ed] to demonstrate that enforcement of the arbitration clause . . . is contrary to the provisions or purpose of the Bankruptcy Code"); *In re Chorus Data Sys., Inc.*, 122 B.R. 845 (Bankr. D.N.H. 1990) (granting motion for relief from stay to compel arbitration to liquidate claim).

Two cases in such line stand out for their more fulsome analysis and discussion of the arbitration issues: *In re BFW Liquidation, LLC*, 459 B.R. 757 (Bankr. N.D. Ala. 2011); and *In re Farmland Indus., Inc.*, 309 B.R. 14 (Bankr. W.D. Mo. 2004). In its Motion, the Law Firm relies extensively on *BFW Liquidation* — and rightly so. In that case, a creditor union fund filed a proof of claim against a Chapter 11 debtor. The debtor objected to the proof of claim spurring the creditor to move for relief from stay and compel arbitration. Under the heading "Claims allowance is a perfect subject for arbitration," the *BFW Liquidation* court stated:

> In fact, the claims allowance process is the perfect 'core' candidate for arbitration. Arbitration is more or less designed to be a summary proceeding as is the claims allowance process in bankruptcy. The goal of both is to determine if anything is owed and, if so how much. In other words, to liquidate the claim.
>
> . . .
>
> Just because something has been referred to the bankruptcy court to be decided, or the bankruptcy court has been empowered to decide a particular issue, or has been given the duty of liquidating, allowing (or disallowing) claims does not limit the means by which the court may accomplish that objective.

*BFW Liquidation*, 459 B.R. at 778. Thus, the decision explains how claims liquidation arbitration is consistent with bankruptcy purposes (*i.e.*, a summary proceeding to decide how much is owed). Ultimately, the *BFW Liquidation* court granted the motion for relief from stay and compelled arbitration to liquidate the creditor's claim.

The *Farmland Industries* case reached the same result. A creditor filed a proof of claim against a Chapter 11 debtor for more than $28 million based upon alleged breach of pre-petition contracts. The debtor objected. Thereafter, the creditor moved for relief from stay to liquidate its claims through arbitration in compliance with contractual arbitration clauses. Engaging in the *McMahon* analysis, the *Farmland Industries* court recognized the weight of precedent:

> . . . enforcement of an arbitration clause arising out of litigation

22

> involving solely pre-petition contracts that are only core inasmuch
> as they involve seeking relief from the automatic stay to proceed to
> arbitration and determining the allowed amount of a proof of claim
> under applicable state law have been found not to conflict with the
> underlying provisions of the Bankruptcy Code.

*Farmland Indus.*, 309 B.R. at 19 (citations omitted).  And, the *Farmland Industries* court confirmed that in the context of the specific claims allowance dispute at issue, "the enforcement of the parties' arbitration agreement in bankruptcy is not overridden by a contrary Congressional command . . . or from an inherent conflict between the parties' arbitration agreement and the underlying purposes of the Bankruptcy Code."  *Id.*  Thus, the relief from stay to liquidate the claim through arbitration was appropriate and ordered.  *Id*. at 19-21.

      For the contrary position, the Debtor relies heavily on *Jalbert v. Zurich Am. Ins. Co. (In re Payton Constr. Corp.)*, 399 B.R. 352 (Bankr. D. Mass. 2009).  In that case, the trustee of a liquidating trust under a confirmed Chapter 11 plan objected to an insurer's administrative expense claim and asserted a variety of counterclaims.  Applying *McMahon*, the *Jalbert* court determined that there was "an inherent conflict between arbitration and the bankruptcy laws' underlying purposes . . . and that Congress intended to preclude a waiver of judicial remedies for such matters."  *Id*. at 364.  *Jalbert* certainly presents a very thorough and articulate counterpoint to the majority approach.  And, the Court candidly recognizes that additional contrary authority also exists.  *See In re Martinez*, 2007 WL 1174186, at *7 (Bankr. S.D. Tex. April 19, 2007) (denying arbitration to liquidate claims and concluding that "arbitrating the Debtor's objection to claim would contravene the Bankruptcy Code's purpose of providing a central forum for resolution of claims"); *In re Mirant Corp.*, 316 B.R. 234, 239-40 (N.D. Tex. 2004) (denying motion for relief from stay to liquidate claims after holding that "liquidation of claims against a bankruptcy estate and their allowance and disallowance is at the very heart of the bankruptcy court's function and purpose").

      The contrary authority is distinguishable.  For example, in *Mirant* (which *Martinez* relied upon almost exclusively) the creditor had not commenced arbitration on its $1 billion claim prior to the bankruptcy case.  *Mirant*, 316 B.R. at 237.  Further, the court was concerned that numerous other large claims based upon agreements containing arbitration clauses likely would surface resulting in "multiple arbitration proceedings."  *Id.* at 241.  The *Mirant* court seemed unwilling to cede control given the size of the claim at issue (and other anticipated claims) as well as the impact in the bankruptcy.  In the principal decision cited by the Debtors, *Jalbert*, the creditor also had not started arbitration proceedings pre-petition.  Further, the underlying issues were not limited merely to the liquidation of claim by arbitration.  Instead, counterclaims for turnover, fraudulent transfer, and avoidance under bankruptcy law were in play.  Faced with a hodge-podge of claims — some of which depended exclusively on bankruptcy law and some not — the court opted to keep the claims together rather than splitting up the case (*i.e.*, arbitrating the proof of claim objection while keeping the bankruptcy-oriented claims in the bankruptcy court).  Additionally, the *Jalbert* court emphasized that arbitration would require proceedings "in a distant forum and under unfamiliar rules, at appreciable expense . . . and with considerable delay."  *Jalbert*, 399 at 364.  None of those considerations are present in this case.  Given the different factual context of this case as compared to the *Jalbert*, *Mirant*, and *Martinez*

circumstances, the Court simply ends in a different place.

To summarize, the Court finds that the Debtor has not meet its burden to establish an inherent conflict between arbitration of the Law Firm's Claim and the Bankruptcy Code. Prior to bankruptcy, the Law Firm and the Debtor were engaged in a state-law fee dispute based upon the Agreement. The Agreement contains a broad Arbitration Clause. It provides a method for arbitrator selection, a location for hearing, confidentiality, general procedural rules, limitations on the scope of discovery, and a commitment to prompt resolution. The Agreement evidences an informal process designed to be fair and expeditious. There is no question but that the underlying fee dispute is arbitrable under the Agreement. Well before the bankruptcy started, the Law Firm started the Arbitration. The parties selected the Arbitrator. He presided over numerous hearings and is quite familiar with the parties and the dispute. The remaining fee issue is not particularly complex and does not involve multiple parties or claims. The Arbitration was almost ready for the final hearing. The evidence established that the Debtor repeatedly delayed the Arbitration. Then, the Debtor engaged in last-minute forum shopping to avoid completion of the Arbitration (which likely would have been finished months ago but for the Debtor's bankruptcy filing).

The Debtor has shown no inherent structural conflict between claims liquidation arbitration and the Bankruptcy Code. Instead, the Debtor focuses on time and expense (and the resulting impact on reorganization). While the Court accepts the Debtor's proffer that the Arbitration process has been expensive before the bankruptcy, there is no competent evidence to suggest that completion of the Arbitration will take longer or be more expensive than resolution by this Court. The Debtor offers only conjecture rather than common sense, for it stands to reason that completion of the Arbitration likely could be concluded more quickly, efficiently, and cheaply than starting from scratch again in this Court. Final resolution also would be expedited through arbitration since appellate rights are quite limited. If this Court adjudicated the Law Firm's Claim and the losing side exercised all available appeals, the final result could take years. The Court determines that prompt and conclusive arbitration of the Claim likely would facilitate the bankruptcy process, including reorganization, rather than impede it. Thus, arbitration of the Claim is mandatory because no inherent conflict has been shown. *McMahon*, 482 U.S. at 226-27; *Mintze*, 434 F.3d at 231; *Thorpe Insulation*, 671 F.3d at 1021.

C.    <u>If the Court Had Discretion, It Still Would Compel Arbitration</u>.

Under the *McMahon* test, the lack of an inherent conflict between arbitration and the Bankruptcy Code in this case dictates that the Court *must* order arbitration under the FAA. Discretionary considerations only come into play if the Debtor establishes an inherent conflict (which it has not). If an inherent conflict is shown, the bankruptcy court still has discretion to decide whether to compel arbitration. *Cashcall*, 781 F.3d at 71. However, even if the Court could exercise its discretion in this case, discretionary considerations point strongly toward arbitration.

Although there is no binding precedent in this jurisdiction establishing a discretionary consideration framework for liquidation of claims by arbitration, the Court relies (at least in part) on two sources: (a) *Curtis*, 40 B.R. at 799-800, which contains a list of factors applicable to

24

decisions concerning relief from stay to permit continuance of federal or state litigation[16]; and (b) *Pelikan Holding AG v. Nu-Kote Holding, Inc. (In re Nu-Kote Holding, Inc.)*, 257 B.R. 855, 863 (Bankr. M.D. Tenn. 2001), which contains a list of factors to be considered in enforcing arbitration agreements in bankruptcy.  From these, the Court distills the following discretionary considerations in deciding whether the Law Firm's Claim should be liquidated by arbitration.

1.      Whether the parties have entered into an arbitration agreement?

The Debtor and the Law Firm entered into the Agreement.  The Agreement contains a broad Arbitration Clause.  The Arbitration Clause covers disputes over attorneys' fees.  The Debtor does not dispute the general arbitrability of the Law Firm's Claim.  This factor favors arbitration.

2.      Whether an arbitration proceeding was started before bankruptcy?

The Law Firm served a "Demand for Arbitration" on July 16, 2015.  However, due to delays in appointment of the Arbitrator, the Arbitrator declared that the Arbitration was "effectively commenced" as of May 18, 2016.  Thus, depending on which date is used, the Arbitration started 9 or 19 months before the Debtor filed for bankruptcy protection on February 16, 2017.  This factor favors arbitration.

3.      If an arbitration was started, whether the arbitration has progressed to the point where the parties are prepared for final hearing?

The Arbitration has progressed substantially.  The parties appointed the Arbitrator and completed all discovery (except potential depositions of expert witnesses).  The Law Firm submitted a dispositive motion.  The Arbitrator dismissed the Debtor's counterclaim.  The final hearing was scheduled for February 6-7, 2017.  However, the final hearing was delayed as a result of the alleged settlement and a skirmish over a motion for sanctions.  But for resolution of the motion for sanctions, the Arbitration has proceeded to the final hearing stage.  This factor favors arbitration.

4.      If an arbitration was started, whether the Arbitrator has specialized knowledge concerning the disputed issues?

The Arbitrator is an attorney based in Fort Collins, Colorado, which is the location for the final hearing.  He may have some knowledge concerning typical legal rates in Northern Colorado.  However, neither party has introduced any evidence showing that the Arbitrator has specialized knowledge concerning attorney fee disputes.  This factor favors adjudication in the Court.

5.      Whether the issue to be arbitrated is core or noncore?

---

[16]      The Debtor also proposed using the *Curtis* factors in resolving the Motion.  (Response at 9-11.)

The dispute concerns the Law Firm's assertion of attorneys' fees. The Law Firm filed the Claim. Thereafter, the Debtor objected to the Claim. Thus, the dispute concerns "allowance or disallowance of claims" and is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). Although the dispute is a core proceeding, the underlying Claim is based entirely on Colorado contract law and the Agreement. The dispute arises independently from bankruptcy law. Accordingly, the matter is a very weak type of core claim that may be characterized as "procedurally core" but not as "substantively core." Since the issue is a very weak form of core matter, this factor is neutral.

6. <u>Whether an arbitration would result in partial or complete resolution of the underlying dispute?</u>

The purpose of the Arbitration is to liquidate the Claim. The Debtor may owe the Law Firm the full amount of the Claim, or nothing, or something in between. Liquidating the amount of the Claim would fully resolve the underlying dispute. This factor favors arbitration.

7. <u>Whether an arbitration would interfere with the bankruptcy case?</u>

The Arbitration would not interfere with the bankruptcy case. The subject of the Arbitration is very discrete: the amount of the Law Firm's Claim. If the matter is not resolved through the Arbitration, it would need to be resolved by the Court. The Claim could be decided by arbitration as quickly and efficiently as in this Court, perhaps more so given the Court's heavy docket. So, resolution by arbitration would facilitate the overall bankruptcy process and reorganization by liquidating an important claim. This factor favors arbitration.

8. <u>Whether the interests of judicial economy and the expeditious and economical determination of the dispute would be served by arbitration?</u>

The interests of judicial economy and efficiency would be best-served by Arbitration. As set forth above, the Arbitrator was selected long ago and the Arbitration is at an advanced stage. The Arbitrator knows the parties and the factual and legal issues. The final hearing originally was scheduled to be completed in February 2017. The Debtor delayed the proceedings. However, there is no reason to doubt that the final hearing cannot be scheduled in short order. Since adjudication in the Court may require starting again from scratch, the Arbitration likely would be more efficient and economical. At worst, the Arbitration would cost about the same as adjudication in the Court since presumably the same witnesses and evidence would be tendered. Because the Court's extremely busy docket would likely prevent the Court from hearing the dispute for many months, judicial economy would be better served by resolving the underlying dispute in arbitration as the parties agreed. This factor favors arbitration.

9. <u>Whether equitable considerations suggest the issue should be resolved by arbitration or in the Court?</u>

The parties agreed to arbitration in their contract. The Arbitration is virtually trial-ready. The Court is concerned that the Debtor has engaged in some last-minute forum shopping that raises equitable considerations. It is apparent that the Debtor filed for bankruptcy primarily to

26

stop the Arbitration and change the decision-maker. That is not the right reason for bankruptcy. This factor favors arbitration.

* * * * *

Accordingly, based on the foregoing factors, the Court would exercise its discretion in favor of arbitration if arbitration were not mandated. The Court also bears in mind that "[b]ankruptcy courts should be reluctant to entertain questions which may equally well be resolved elsewhere." *First State Bank & Tr. Co. of Guthrie, Okla. v. Sand Springs State Bank of Sand Springs, Okla.*, 528 F.2d 350, 354 (10th Cir. 1976).

D.   Relief from Stay Should Be Granted.

Section 362(a)(1) establishes an automatic stay in bankruptcy cases and generally prohibits:

> . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

The automatic stay stopped the Arbitration. But, the Law Firm seeks relief from the automatic stay for cause under Section 362(d)(1) which states:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

Relief from stay proceedings are summary in nature and determined on an expedited basis. "It is not a full determination of the merits." *U.S. Bank, N.A. v. Brumfiel (In re Brumfiel)*, 514 B.R. 637, 645 (Bankr. D. Colo. 2014). For the reasons stated above, relief from stay for cause is warranted under Section 362(d)(1) to allow liquidation of the Claim through arbitration.[17]

IV.   Order.

The Court, therefore,

ORDERS that the Motion is GRANTED. The Law Firm is authorized to continue the Arbitration for purposes of liquidating the Claim. The parties are compelled to arbitrate.

---

[17]   The Motion also requested that the Court abstain from adjudicating the Claim (in favor of arbitration) under 28 U.S.C. § 1334(c)(1). (Motion at 1, 5 and 8-9.) The Debtor also briefed abstention issues. (Response at 11-13.) Given the Court's disposition of the Motion, the Court need not address mandatory or discretionary abstention.

27

Promptly after completion of the Arbitration, the parties shall provide the Court with notice of the final arbitration award for purposes of allowance or disallowance of the Claim.  The Law Firm is not authorized to execute on any final arbitration award against the Debtor or the Debtor's Estate.

Dated this 21th day of August 2017.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Court Judge